IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

February 2, 2021 Session

## STATE OF TENNESSEE V. PHILLIP MICHAEL MARTINEZ

**Appeal from the Circuit Court for Gibson County**
**No. 19545     Clayburn Peeples, Judge**

_____

### No. W2019-02033-CCA-R3-CD
_____

A Gibson County Grand Jury indicted the Defendant, Phillip Michael Martinez, for attempted aggravated sexual battery in Count 1 and solicitation of a minor in Count 2. Prior to trial, the State entered a nolle prosequi for the solicitation of a minor charge. At the conclusion of trial, the jury found the Defendant guilty as charged of the attempted aggravated sexual battery count. See Tenn. Code Ann. §§ 39-12-101; 39-13-504(a)(4). Thereafter, the trial court sentenced the Defendant to three years' incarceration at thirty percent release eligibility, sentenced him to community supervision for life, and ordered him to register as a sexual offender for life. On appeal, the Defendant argues: (1) the trial court erred in allowing the forensic interviewer to testify as an expert; (2) the trial court erred in admitting the victim's forensic interview as substantive evidence; (3) the trial court erred in instructing the jury on flight; (4) the State made two improper comments during its closing argument; and (5) the evidence is insufficient to sustain his conviction because the proof failed to show that he acted for the purpose of sexual arousal or gratification. After review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and J. ROSS DYER, JJ., joined.

Rachele Gibson, District Public Defender, and M. Todd Ridley, Assistant Public Defender, for the Defendant-Appellant, Phillip Michael Martinez.

Herbert H. Slatery III, Attorney General and Reporter; Samantha L. Simpson, Assistant Attorney General; Garry G. Brown, District Attorney General; and Jennifer McEwen, Jason Scott and Scott Kirk, Assistant District Attorneys General, for the Appellee, State of Tennessee.

## OPINION

This case concerns the Defendant's attempted aggravated sexual battery of the victim, P.B.,[1] at a movie theater in Milan, Tennessee, on July 1, 2016. Because the State entered a nolle prosequi of the Defendant's solicitation of a minor charge, the remaining charge of attempted aggravated sexual battery was tried before a Gibson County Circuit Court jury.

M.B. testified that on the night of July 1, 2016, she took P.B., her six-year-old son, and two of her other children to see the movie "Finding Dory" at the Milan theater. During the movie, P.B. left to go to the bathroom. When he returned five minutes later, P.B. informed her that "some man in the bathroom touched his private." M.B. said that when P.B. informed her of this incident, he was "teary eyed[,]" and she "knew something was wrong[.]"

M.B. immediately took P.B. to the theater's lobby where they talked with the theater owners about what had happened. P.B. told the owners that the man in the bathroom had been wearing a red shirt, and the owners called the police. M.B. said that the theater owners told her and P.B. to finish watching the movie while they waited for the police to arrive, and she acknowledged that at that time, a suspect had not yet been identified. She said that when Officer Kelvin Whitney from the Milan Police Department arrived at the theater, P.B. was "crying" and "upset" and told him that a man had touched his private area in the theater bathroom. P.B. also identified the Defendant, who was wearing a red shirt in the theater's surveillance video, as the man who touched him inappropriately. M.B. explained that she did not know the Defendant and had never seen the Defendant before P.B. identified him on the surveillance video. She said that approximately three weeks after the incident, P.B. discussed what had happened to him during a forensic interview at the Carl Perkins Center.

P.B. testified that he had gone to see "Finding Dory" at the theater in Milan and that when he went to the theater bathroom that night, a man in a red shirt came in, blocked the bathroom door, and "asked if he could touch [P.B.'s] private spot." P.B. said the man pulled down P.B.'s pants and "squeezed" his "penis." Afterward, P.B. pulled up his pants, left the bathroom, and told his mother that "somebody touched [his] private spot." P.B. said that the incident made him feel "[c]onfused" and "mad." After this incident, P.B. told the owners of the theater what happened, and then they returned to the movie while they waited for the police to arrive. P.B. later told the police that "somebody touched [his] private spot" and that the man who did this was wearing a red shirt. P.B. later identified the man who touched him inappropriately from the theater surveillance video. P.B. also

---

[1] It is this court's policy to refer to the minor victim of a sexual offense, as well as the minor victim's family members, by their initials only.

identified a man in a red shirt as the man who touched his inappropriately in still photographs made from the theater's surveillance video, and these photographs were admitted into evidence. P.B. said that after he discussed the incident with his mother, the theater owners, and the police, he also talked to "a lady" and the prosecutor about it. P.B. said that he did not see the man from the bathroom in the courtroom and that he could not recall what the man from the bathroom looked like.

On cross-examination, P.B. said that he had already used the bathroom and was in the restroom alone when the man with the red shirt came in. He said this man stood in front of the door so he could not leave and asked him "if he could touch it," and P.B. said, "No." At the time, P.B.'s pants were pulled up. When asked what happened next, P.B. said, "[The man] pulled—he touched my private." P.B. said that when he and his mother talked to the theater owners about what happened, his mother explained most of it, but he "told them a little bit, but not like all of it." P.B. then "told the police" what the man had done to him in the restroom. P.B. also recalled discussing what happened with a lady but did not recall telling this lady that the man had not touched him in the theater bathroom. When asked if he thought he told this lady something different, P.B. replied, "I don't remember." P.B. said that after the man touched him, he left the restroom because the man was no longer blocking the door, and he told his mother what happened. He said he did not see where the man went after the incident in the bathroom and did not recall telling the police that he saw the man go into the other room where a movie was being shown.

Sherry Crooks, one of the owners of the Milan movie theater, testified that around 8:00 p.m. on July 1, 2016, M.B. came out with P.B. to the theater's lobby, and M.B. informed her that a man had touched P.B. inappropriately in the theater's bathroom. Mrs. Crooks[2] talked to her husband about the situation, and they called the police. She stated that P.B. said this man was wearing a red shirt and shorts, but he never told her what happened in the bathroom. At the time, she did not know who the man in the red shirt was. Mrs. Crooks said that M.B. and P.B. went back inside the theater to be with M.B.'s other children while she called the Milan Police Department.

Mrs. Crooks stated that the police arrived approximately five minutes after they called them. She and her husband pulled up the theater's surveillance video for the officers so that they could try to identify the man described by P.B. Upon reviewing the substantial surveillance video footage, P.B. identified the Defendant as the man in the red shirt from the bathroom. Mrs. Crooks said she knew the Defendant, whom she described as "very polite[,]" because the Defendant and two of the Granims children were frequent customers

---

[2] We have identified certain witnesses by their title or their first name in order to distinguish them from other witnesses with the same surname. However, we generally refer to witnesses by their surname for efficiency purposes, and we mean no disrespect in doing so.

at the theater. Mrs. Crooks recalled that the Defendant's first name was Phillip, and she was able to retrieve his credit card receipt to determine that the Defendant's last name was Martinez, and she provided this information to the police. The receipt showed that the Defendant had purchased his movie tickets on July 1, 2016, at 6:26 p.m. Mrs. Crooks also identified the Defendant at trial as the man from the surveillance video.

Mrs. Crooks remembered the Defendant being present at the theater the night of July 1. She sold the Defendant his movie tickets that night, and she said the Defendant acted normally and did not appear to be sick at the time. She recalled seeing the Defendant headed toward the restroom at a later point. Mrs. Crooks stated that the theater's bathroom was "very small" with only one stall and one urinal. She then saw the Defendant leave the theater for a long period of time to take a phone call, during which he seemed "concerned," before he returned to the theater and left with the Granims children. Mrs. Crooks thought that it was "odd" that the Defendant and the Granims children left the theater before the movie ended. She noted that the Defendant appeared "[c]oncerned, like he was bothered" when the exited the theater and that the Defendant and the Gramins children left the theater just minutes after P.B.'s mother made the report to her. She also confirmed that the Defendant and the children with him left the theater before the police arrived.

Mark Crooks, Sherry Crooks's husband, testified that he had seen the Defendant on prior occasions at the theater. He said that when he saw the Defendant on July 1, 2016, the Defendant appeared normal before P.B.'s mother reported the incident in the bathroom, but the Defendant "looked concerned" when he was talking on his cell phone just after the incident was reported. Mr. Crooks acknowledged that he did not hear the substance of the Defendant's phone conversation. He noted that the Defendant "seemed very concerned" and that the Defendant left the theater "in a hurry" before the movie he had been watching was over. He said that he did not see the Defendant going in and out of the bathroom as if he were ill the night of July 1. Mr. Crooks identified the Defendant at trial as the same man he had seen in the theater on July 1, 2016.

Leslie Crooks, Sherry Crook's daughter-in-law, testified that she was working at the Milan Theater the night of July 1, 2016. She said that after she heard M.B. make the report to Sherry Crooks about what happened to P.B., she retrieved the surveillance footage. When the officer arrived, he asked her to play through the footage to look for "what [P.B.] described as a man in a red shirt and black shorts." She said that as the officer and P.B. looked on, she played approximately an hours' worth of footage to look at all the people who were in the theater that night. Leslie Crooks stated that after showing P.B. several individuals who matched the description he gave, P.B. identified the Defendant in several different portions of the video as the man in the red shirt who had been in the bathroom with him. She noted that although she did not know the Defendant's name, she recognized him as a frequent customer at the theater. She also noted that the surveillance footage

showed that the Defendant had been to the concession stand three or four times that night. Leslie Crooks explained that the time listed in the surveillance video was approximately one day and one hour earlier than the actual day and time that the events occurred. She identified the Defendant at trial as the man wearing the red shirt in the video footage.

Relevant portions of this surveillance video were played for the jury, and Leslie Crooks confirmed that the footage fairly and accurately represented the portions of the video that P.B. saw that night. The portions of the surveillance video played for the jury showed the Defendant buying a ticket for him and the Granims children at 5:24 p.m. From 6:56 p.m. to 6:58 p.m., the video depicts M.B. and P.B. disclosing the incident in the theater bathroom to the theater owners. From nearly 6:59 p.m. to 7:00 p.m., the video shows the Defendant exiting the concession area, appearing to talk on his cell phone while pacing back and forth, and then walking past the concession area inside the theater with his sunglasses on. At 7:01 p.m., the video shows the Defendant and the Granims children exiting the theater.

Officer Kelvin Whitney of the Milan Police Department testified that he responded to the July 1, 2016 call at the theater in less than five minutes. When he arrived, he talked with M.B. and P.B., although he did not ask P.B. many questions because he felt that job should be left to the forensic interviewer. Officer Whitney said that he could tell P.B. was "scared" when he talked to him. P.B. told him that a man had "followed him" into the theater restroom and "touched . . . his penis area." Officer Whitney acknowledged that he did not review the surveillance video because Investigator David Blurton reviewed it. Officer Whitney also acknowledged that he did not speak with the Defendant and did not take any written statements.

Detective Dennis Mitchell of the Milan Police Department testified that he was first assigned to this investigation on July 5, 2016. He said that after receiving the Defendant's last name, he cross-referenced driver's license information with the license plate on a vehicle, which provided him with an address on Shepard Street in Milan for the Defendant. On July 5, 2016, he and Investigator Blurton went to that address, found the Defendant's vehicle, spoke to the Defendant, and brought him to the police station for questioning the same day. Prior to any questioning, Detective Mitchell informed the Defendant of his rights. During this July 5, 2016 interview, which was video and audio recorded, the Defendant initially claimed he had been vacationing in New Jersey on July 1, 2016; however, when confronted with a still shot of him from the surveillance footage and his signature on the theater receipt, the Defendant acknowledged that he was present at the theater on July 1, 2016. Detective Mitchell said the Defendant later acknowledged that he had "some type of altercation" with P.B. at the movie theater. However, the Defendant denied touching P.B. and denied asking if he could touch P.B.'s penis. When Detective Mitchell asked the Defendant why he left the movie prior it being over, the Defendant

claimed that he was having some intestinal issues, which required him to leave. The Defendant also claimed that he was in the theater bathroom because of his intestinal distress. At the end of this interview, Detective Mitchell placed the Defendant under arrest.

On cross-examination, Detective Mitchell acknowledged that he had not been to the movie theater and had not spoken to P.B. at the time of the Defendant's arrest. During Detective Mitchell's testimony, the video recording of the Defendant's interview was played for the jury. In it, the Defendant stated that he had gone to New Jersey around the end of June and returned to Milan a few days ago. Later, he admitted that he had been in town the weekend of July 1, 2016. When the Defendant was shown a still shot of him taken from the theater's surveillance video and a receipt from his movie ticket, he said, "I guess it's me," before stating that he supposed he was at the movies the past Friday rather than the previous Friday. When asked if there was an incident while he was at the movies that night, the Defendant said that he went to the theater bathroom and entered a stall that did not have a lock, and a young boy opened the stall door and stared at him and would not shut the door. Detective Mitchell said that although the Defendant indicated that the boy had come in the bathroom after him, the evidence he had showed that the boy was already in bathroom and that the Defendant entered the bathroom and then touched the boy's private part. The Defendant replied that he "didn't touch anything" and that when the boy "opened the door on [him,]" he told the boy, "Don't make me tell your mom." He also claimed that he went past the boy at the urinal before entering the bathroom stall. The Defendant said that he was in the stall because his stomach was hurting and he had diarrhea. Detective Mitchell asked the Defendant why a six-year-old boy would tell his mother that a man touched his private while he was at the urinal, asked him if he liked it, and then asked if he could touch it again, and the Defendant replied, "I swear to God that I would never do something like that." When Detective Mitchell asked why would a six-year-old boy would make up that story, the Defendant suggested that after he yelled at the boy to shut the stall door, the boy got mad, and told him mom a lie about what happened. Detective Mitchell said that the surveillance video showed the Defendant coming out of the bathroom, immediately getting on his cell phone, and then leaving the theater before the movie he was watching was over. The Defendant claimed that a friend actually called him on his cell phone, that he told the friend that he had to quickly end the conversation, and then he told the kids with him that they had to leave the movie early because his stomach hurt. He said that the friend who called him was named "Brett," although he did not know Brett's last name and did not know Brett's phone number.

Also on cross-examination, Detective Mitchell stated that he was present for P.B.'s forensic interview but actually watched the interview live on a television in a different room. The defense then elicited the following information from Detective Mitchell:

| | |
|---|---|
| Defense Counsel: | During that interview did [P.B.] say that he had been touched at the theatre? |
| Detective Mitchell: | No. He did not. |
| Defense Counsel: | He denied ever being touched at the theatre. Is that correct? |
| Detective Mitchell: | He—he stated during the interview that the incident happened, but he never included the part about the touching. |
| Defense Counsel: | He explicitly denied being touched. Isn't that correct? |
| Detective Mitchell: | Yeah. I recall that being correct, that he denied when asked. |

On redirect examination, Detective Mitchell said that he recalled P.B. saying in the forensic interview that the Defendant asked if he could touch P.B.'s penis in the theater's restroom. He noted that P.B. made "a disclosure" that "would be seen as sexual abuse[,]" but he recalled P.B. "deny[ing] the actual touching [of] his penis." When asked if P.B. explained why he denied that the Defendant touched his penis, Detective Mitchell stated, "I don't recall. I don't recall what [P.B.] said about that."

Detective Mitchell said there was a twenty-four-day delay between the July 1, 2016 incident and P.B.'s forensic interview. He acknowledged that it was the best practice to set up the forensic interview as quickly as possible after the incident, especially when dealing with young children. When asked if the twenty-four-day delay in this case was excessive, he stated that such a delay was "not uncommon" because there were so few forensic interviewers in West Tennessee. However, he stated that he did not know the "exact reason" why P.B.'s forensic interview was delayed.

Detective Mitchell reiterated that in order to find the Defendant, he ran the Defendant's drivers license and cross-referenced it with a license plate in order to get the potential address associated with the Defendant's name on the theater receipt. He stated that a regular person could not conduct this type of investigation and that the police had to run these searches in order to determine where the Defendant might be. He stated that the Defendant did not own the home that he was living in and that he was living there with other individuals. He also said that he did not believe the utilities were in the Defendant's name at the house where he was living.

Detective Mitchell asserted that he often instructed the parent not to speak to the child about the incident because he did not "want to run the risk of a parent . . . prompting a child to come to an interview and . . . say something that's not true." When asked if it was common for children's stories to change over the course of an investigation, he stated that "it's not common that the story itself changes, but sometimes [the children] forget details." He asserted that P.B.'s interview might have yielded different results if it had been conducted the night of the incident. He also said that because the forensic interview in this case took place three weeks after the incident, P.B. "could have forgotten some things[.]" He also acknowledged that the faster the forensic interview is conducted the more likely it is to be accurate. When asked what kinds of things will cause a child to recant and change their story, Detective Mitchell replied:

> [A] parent could prompt a child what to say or not to say. . . . Time. . . . [I]t's very important that we do the forensic interview as soon as possible because the child is going to remember then. They may forget things or not state things the same three weeks later as they would today.

On recross examination, Detective Mitchell read aloud his notes from the forensic interview, which stated, "[P.B.] denied that the grownup, [the Defendant], actually touched his penis. [P.B.] plainly stated today that the grownup, [the Defendant], only looked at [his] penis and the grownup, [the Defendant], asked [P.B.] if he could touch his penis."

Sydni Turner testified that she had been a forensic interviewer for almost three-and-a-half years and that she had conducted the forensic interview with P.B. on July 25, 2016, at the Carl Perkins Center, an accredited child advocacy center focused on preventing and treating child victims of physical and sexual abuse. She explained that "[a] forensic interview is a single session interview utilized to elicit a child's specific statement regarding any kind of allegation of sexual abuse, physical abuse, drug exposures and even witnesses to crimes." She said that every county in Tennessee conducts forensic interviewing and that the State has been doing forensic interviewing for the last fourteen years.

The recording of P.B.'s forensic interview was played for the jury. In it, P.B. stated that no one had ever touched his body inappropriately. He said, without elaboration, that his mother "told him not to tell nobody." P.B. said that the night at the movie theater, he encountered a man wearing a red shirt and black pants in the theater's bathroom. P.B. said that right after he finished using the bathroom, the man entered the bathroom and tried to touch his "private," but P.B. said "No." At the time, he and this man were the only people in the bathroom. He stated that the man saw his "private" because P.B. had been using the

bathroom but that this man did not touch P.B.'s "private" part. P.B. said that after telling the man, "No," the man went into the bathroom stall. P.B. said that he left the bathroom and told his mother what had happened. Then, he and his mother went to the front desk, and "they called the cops." P.B. stated that he did not see the man's private parts and that the man in the bathroom did not touch P.B.'s private parts. When Turner asked P.B. if he told his mother something other than what he told her, P.B. paused and then said, "No."

Turner stated that in order to be a forensic interviewer, she was required to have, at a minimum, a bachelor's degree in some field of social services. She said she had received a bachelor's degree in psychology from the University of Memphis and a master's degree in social work in 2018 from the University of Tennessee—Knoxville. She also completed a required forty-hour general forensic interviewing of children training at the National Child Advocacy Center in Huntsville, Alabama in December 2015. Turner said that while she was required to complete eight hours of supervision under a trained forensic interviewer, she actually completed sixty-seven hours of supervision.

Turner said that she began conducting forensic interviews in January 2016 and that as of the date of the Defendant's trial, she had completed 1200 forensic interviews. She confirmed that she routinely conducts 16-18 forensic interviews a week and regularly completes continuing education in the field of forensic interviewing. A copy of Turner's CV was admitted into evidence. Turner said that prior to becoming a forensic interviewer, she worked at the Carl Perkins Center for nearly ten years as a Family Advocate working on case management and as an office manager transcribing interviews. Turner said that in her role as a forensic interviewer, she serves on the Child Protective Investigative Team and is a member of that team in all twenty counties that the Carl Perkins Center serves. Turner asserted that all of her forensic interviews are peer reviewed, which means that her supervisor, who is a seasoned forensic interviewer, and the other forensic interviewers in her office meet and critique each forensic interview. She said she follows the National Child Advocacy Center protocol, which is the one most used in Tennessee and is a semi-structured protocol that takes into account the child's delays, disabilities, speech, and age and is focused on what the child wants to talk about. She said she had testified in court twenty times and had been qualified as an expert more than once in the field of forensic interviewing. Turner was accepted as an expert in the field of forensic interviewing.

Turner stated that the child advocacy center where P.B.'s forensic interview was conducted is a neutral, non-threatening environment. Prior to the forensic interview the children are told the are "not in trouble for being there" and that they are "going to talk about whatever they want to talk about" and that they need to "talk[ ] about the truth." She explained that there is an observation room, near the forensic interview room, where the Department of Children's Services worker and a law enforcement officer observe the forensic interview live on a monitor. Before the interview takes place, the child and parent

are told that the forensic interview is being recorded and that certain identified individuals will be observing.  However, she explained that just the forensic interviewer and the child are in the room while the interview is taking place.  She stated that her questions during the forensic interview are "non-leading" and "non-suggestive."

When asked, based on her training and experience, about the different types of outcomes from a forensic interview, Turner said, "[B]ased on my experience from forensic interviewing, there are different types of disclosures.  Sometimes there are no disclosures at all.  Sometimes there are partial disclosures or tentative disclosures and also there are full disclosures[.]"  She stated that P.B.'s disclosure during the forensic interview was not a "partial disclosure because that would mean that he said something happened and gave no detail about it."  Instead, she said that P.B.'s disclosure was "more of a disclosure where he . . . was reluctant to talk to me, so it was more of what we would just call a reluctant disclosure—reluctant child."  She also stated that recantations can occur, when "a child makes a disclosure of some sort and then takes back what they said or changes what they say."  When asked if she had been trained on any factors that might influence the outcome of a forensic interview, Turner replied:

> Yes.  There's both positive and negative influences that can cause outcomes in a forensic interview . . . .
>
> The positive things would be if a child is, number one, believed about whatever they outcry about and . . . they have positive person in—you know, support person, adult, that . . . is there and however they respond to whatever [the child] say[s].  Whether that's negative or positive, that affects interviews in general.  Of course, if there's external factors where there's been a major disruption in the child's life based upon what's occurred or what the child says.  We've had different things happen where . . . the main provider in the home is the perpetrator and so that child feels like they can't talk about what happened because that person pays the bills and that sort of thing . . . or if . . . anyone tells the child what to say or what not to say, . . . there's some sort of consequence for that as well.  That's just . . . some different things that have happened.

She said that the timing of the forensic interview can play a factor in the form of the disclosure because if the child has "made a disclosure and then things have already been taken care of or moved forward, [the child] can move on and not want to bring it back up again."  Turner said the "best practice" is for the forensic interview to take place "immediately."  She noted that the interview was not scheduled until July 5, 2016, and did

not take place until twenty days later, which was "not the best practice, but for whatever reason that's what happened, whether it was something going on with . . . the availability, the amount of cases we had at the time[.]"

Mark Ryan Crooks, Sherry and Mark Crooks' son, testified that he recalled the incident on July 1, 2016, when he was working at his parents' movie theater. He noticed "some boys that kept going in and out of the bathroom, which is typical," and he observed the Defendant "coming in and out of the theater[,] and he didn't always get concessions . . . but he kept coming in and out." He also saw a boy come out of the bathroom, come "back [into the lobby] with his mom[,]" and then the boy and his mother "went to my parents and told them something" that "shocked" his parents. He stated that five to ten minutes after the Defendant left the bathroom, the boy and his mother came out of the theater and talked to his parents. Mark Ryan said that this boy and his mom mentioned that "the guy was wearing a red shirt" and as he looked for someone wearing a red shirt in the theaters, he saw the Defendant, who was wearing a red shirt and was later identified by the child as the perpetrator, go outside and talk on the phone. Then he saw the Defendant come "back in[,]" and the Defendant "grabbed" the boys that were with him and "left before any police arrived." He confirmed that the Defendant left with the boys before the movie they were watching had ended. Mark Ryan said he did not think the Defendant had been alerted or identified at the point that he left the movie theater.

Bradley Granims, the Granims' oldest child, testified that the Defendant was a close family friend who lived with his family for a period of time. He remembered leaving the theater early on July 1, 2016, after the Defendant said he was not feeling well. He asserted that they were not in a hurry when they left the theater.

Patricia Granims testified that the Defendant had resided with her family when they lived in Florida and Tennessee. She said that the Defendant helped care for three of her sons while one of her sons was receiving cancer treatments at St. Jude's Hospital. She stated that on July 1, 2016, she was in Texas with her husband while her children were being cared for by the Defendant. She said she had no concerns with the Defendant being alone with her children and had never seen the Defendant behave in an inappropriate manner with her children. Patricia said that although law enforcement took all of their phones, computers, and laptops, they were able to get all of these things back, and she knew of no issues with anything on these electric devices.

The Defendant did not testify on his own behalf at trial.

At the conclusion of trial, the jury found the Defendant guilty of the charged offense of attempted aggravated sexual battery. Following a sentencing hearing, the trial court determined that the Defendant was a Range I, standard offender and imposed a sentence of

three years at thirty percent release eligibility, sentenced him to community supervision for life, and ordered him to register as a sexual offender for life.

The Defendant timely filed a motion for new trial. Thereafter, he filed an amended motion for new trial, alleging, in pertinent part, that the evidence was insufficient to sustain his conviction; that the trial court erred in qualifying Sydni Turner as an expert in the field of forensic interviewing; that the trial court erred in admitting the forensic interview, given that the forensic interview was inadmissible hearsay and was not admissible pursuant to Code section 24-7-123; that the prosecutor made improper arguments during closing argument; and that the trial court erred in instructing the jury on the inference of guilt arising from flight of the accused. Following a hearing, the trial court denied the motion for a new trial without elaboration. The Defendant then filed a timely notice of appeal.

## ANALYSIS

**I. Forensic Interviewer's Expert Testimony.** The Defendant argues that the trial court abused its discretion in allowing Sydni Turner to testify as an expert witness regarding P.B.'s forensic interview, which prejudiced his defense. He asserts that "the basis and scope" of "Turner's claimed expertise" was unclear from the record and that the only purpose of Turner's testimony "was to improperly bolster" P.B.'s credibility, see State v. Ballard, 855 S.W.2d 557 (Tenn. 1993); State v. Bolin, 922 S.W.2d 870 (Tenn. 1996). The Defendant asserts that "[t]he State was rightfully concerned that the inconsistencies in P.B.'s story might very well lead the jury to acquit [the Defendant]" and "clearly viewed Ms. Turner as an essential witness to rehabilitate P.B." In response, the State contends that the trial court appropriately limited Turner's testimony to explaining the process of conducting a forensic interview and the factors that can affect a minor victim's disclosure. The State also insists that Turner's testimony, which did not provide an opinion on an ultimate issue, did not improperly bolster P.B.'s credibility and merely assisted the jury by providing a context for P.B.'s inconsistent statement. We conclude that although the trial court erred in allowing Turner to testify as an expert under these circumstances, the error was harmless.

Because the issues regarding the admission of Turner's testimony and the forensic interview are intertwined, we will summarize the relevant portions of the record as to both issues here. During a jury-out hearing after the conclusion of Detective Mitchell's testimony at trial, the State informed the trial court that it wished to call Sydni Turner, the forensic interviewer, for the "limited purpose of talking about part of [P.B.'s] interview" and that it sought to qualify Turner as an expert witness. When the trial court inquired about the substance of Turner's testimony, the State said that it initially intended to call Turner "in our case in chief to discuss her involvement in the forensic [interview]." The State added that because it now "anticipated [the defense] getting into [P.B.'s] allegedly

prior inconsistent statement [in which P.B. denied that the Defendant touched his penis in the forensic interview,]" it wanted to respond by qualifying Turner "as an expert in forensic interviewing of . . . sexual assault victims [who] are children" and then questioning Turner about P.B.'s forensic interview. When the trial court inquired about the defense's understanding of the law regarding the admissibility of forensic interviews, defense counsel replied, "It's my understanding that [the forensic interview] can possibly be used to impeach [P.B.] at this point, which we've used it to do so, but otherwise it would have been hearsay that I couldn't have gotten in and that's looking at it from a defense standpoint and [the State is] almost in my position." At that point, the State asserted that it was not planning to play "any portion of the forensic interview unless [it went] with the position that [it] held earlier of the mother telling [P.B.] to stop talking about the incident, so only that portion [of the forensic interview]." The trial court expressed its concern that the State would ask Turner to evaluate P.B.'s interview, and the State assured the court that it would not be asking Turner about whether or not P.B. told the truth during the forensic interview and would only be asking Turner about her experience and training on body language, about whether P.B. was going to disclose anything, regardless of its truthfulness, and about whether P.B. was reluctant to speak with her because of parental influence, which was what P.B. admitted during the forensic interview. The State said it would also ask Turner about whether there were "situational factors," like having a twenty-day delay between the incident and the forensic interview, that made "it more common for a child to recant or partially disclose[.]" Defense counsel asserted that she definitely wanted "to look at what would qualify [Turner] as an expert" and that she "would object to the entry of this forensic [interview] for those purposes."

The following day in a hearing outside the presence of the jury just prior to trial proceeding, the State reiterated its desire to have Sydni Turner testify as an expert, stating:

> The defense has opened the door to put [Sydni Turner] on in this capacity and specifically they have elicited a prior inconsistent statement, which was said during the context of a forensic interview. They did that through the witness, Dennis Mitchell. They are going to argue that [P.B.'s] statement [during the forensic interview denying that the Defendant touched his penis] was actually the correct statement. We need the forensic interviewer[, Sydni Turner,] to educate the jury on . . . how to evaluate and assess statements made during a forensic interview totally based [o]n how the forensic interviews are conducted, the line of questioning that is presented, how that's different and the possible outcomes of the forensic interviews, what each one of those are and possible risk factors that can contribute to different possible outcomes.

> I'm not going to ask her anything about this specific interview.

- 13 -

The defense immediately responded that the requirements of Code section 24-7-123, which governs the admissibility of forensic interviews, had not been met because "the child alleged no sexual contact" during the forensic interview. At this, the State again insisted it had no intention of introducing the recording of the forensic interview. Instead, it wanted Sydni Turner to provide expert testimony about "how these interviews are conducted, why they're conducted, the qualifications and trainings to be a forensic interviewer, the ages of [the] children interviewed, the difference in limitations of the forensic interviewers and what they can ask versus what I can ask and what law enforcement can ask, the possible scenarios, which can include a full disclosure, a partial disclosure, a non-disclosure, a recantation and the factors that are risk factors for providing or producing such type of disclosure . . . based on her training and experience." In response, the defense argued:

> I think that the State is seeking to . . . elicit expert testimony on something that's not in evidence and . . . this is not appropriate unless you're admitting the forensic interview into evidence. They can't. I don't think they can under the statute that talks about whether or not it comes in, so I don't think that [Turner's] testimony is appropriate without the forensic interview being admitted into evidence and I think that takes some of the fact finding power away from the jury.

The defense added, "[The State's prosecutors do not] want to admit the forensic interview, but they want to admit expert testimony surrounding the forensic interview. . . . All that is entirely prejudicial to us. We're asking that you rule against it."

The trial court then stated, "If the forensic interview is not admitted, then the only thing the jury has to go on is the live testimony and the only reason for [Syndi Turner] to testify would be to help the jury evaluate the live testimony." The State agreed that Turner's testimony would "help the jury evaluate the [prior] inconsistent statement [made by P.B.] which was a disclosure in a forensic interview[.]" When the defense asserted that the State's authority in support of Turner's expert testimony, which was an out-of-state law journal article, was limited to situations in which the expert testified when the forensic interview was also admitted, the State argued:

> I think if you look at the situation[, the defense] has opened the door to this forensic interview. If [the defense] wants the interview fully admitted then as a matter of completeness, Your Honor, we should put that in regardless of the statute. If [the defense] is taking [P.B.'s] statement [during the forensic interview denying that the Defendant touched his penis] out of context[, then]

- 14 -

for completeness [the State] should be able to play the entire [forensic interview] video and then the forensic interviewer can talk as to what she observed that day and as to her expertise in risk factors. I would never ask [Turner] to in any way talk about whether she believed [P.B.] or not or whether the jury should believe him or not, but if she is trained on risk factors that absolutely affect, such as a time delay, . . . that absolutely affect the disclosure[.]"

The State added that Sydni Turner has been "recognized multiple times" in "[t]he field of forensic interviewing of child sex abuse victims."

The trial court then asked, "If [Turner]'s an expert in forensic interviews and we don't have a forensic interview[,] why should she testify?" The State replied that "you have [P.B.]'s statement from the forensic interview [that was testified to by Detective Mitchell] and if that is the case then we should be absolutely entitled as a matter of fairness to put [P.B.'s] entire statement in[.]" When the trial court asked the defense why P.B.'s entire forensic statement would not come in under the circumstances, defense counsel replied:

> I don't think at this point [the State] has a way to get [the forensic interview] in and I argue that with . . . some degree of sympathy to [the State]. I've had this situation exactly. We didn't end up trying the case, but there was a child who went to a forensic interview, made no disclosure, had made disclosures other places but not at the forensic interview and when you read the statute there was no way for me to get that in. I couldn't play it. . . . [I]t was very limiting.

The trial court responded that it wanted to "hear from the proffered expert."

The State then conducted a proffer out of the presence of the jury in which Sydni Turner testified that she had been a forensic interviewer in West Tennessee for the last three-and-a-half years. She stated that she had conducted 1200 forensic interviews in cases involving the sexual abuse and physical abuse of children as well as cases in which children had drug exposure or had been witnesses to crimes. She explained that she had been qualified as an expert in the field of forensic interviewing more than once. Turner said that when she had previously been qualified as an expert, she had testified about "the structure of forensic interviewing, children's disclosures, child development" and the "reluctance of children" to disclosure during forensic interviews. However, she stated that as an expert, she never testified about any kind of medical or psychological symptoms that were exhibited by the child. She stated that she had received specific training on external risk factors that could affect what type of disclosure a child made during a forensic interview.

- 15 -

When asked about the possible outcomes from a forensic interview, Turner stated that some children come in and "make full disclosures about . . . everything that could have possibly happened to them[,]" some children "make partial disclosures" where they "identify that something happened and don't give a lot of detail[,]" some children are "reluctant to talk at all[,]" some children "make no disclosures[,]" and some children, who have previously made a disclosure, recant while in the forensic interview. When asked if there were any risk factors that might contribute to a recantation or partial disclosure during the forensic interview, Turner stated:

> There's a bunch of different reasons as to why a child might recant. It might be however many times they had to . . . talk about their story. It could be how . . . adults or other people reacted to whatever happened. It could be that they were told by someone what to say and what not to say. It could also be that . . . they are more reserved. Don't want to talk about certain things. . . . I've had children that talk to me all day about football and we get to . . . the other things about body parts and things like that, they don't want to talk about those things.

Turner explained that if a caregiver or a member of the public reacted negatively to what happened to the child, then that could prevent the child from making a disclosure or a full disclosure. However, she said that if a caregiver or a member of the public reacted positively to what happened to the child, then this could result in a full disclosure because it gives the child confidence. Turner also said that a delay between the initial disclosure and the forensic interview could affect a child's disclosure because a child "might feel like I've already talked about it. I'm moving on. I'm not gonna bring it up again to this person who is telling me [I] don't have to say anything [I] don't want to say[.]" Turner added that if the child made a disclosure and things return to normal, and then the child is asked to talk to the forensic interviewer about the incident, it may be "more difficult" for the child to disclose during the forensic interview. Turner said that in the forensic interviews that she has conducted, children have given full disclosures, partial disclosures, and partial disclosures with partial recantations. She said that in interviews where the child recants, there is sometimes a second interview, where the child says that their recantation or inconsistent statement was not the truth, and the child goes back to the original disclosure that he or she made. When Turner said that she has had experience with a child's story changing or evolving over time, the defense objected, stating, "I think this is outside her . . . area of expertise[.]"

At the conclusion of the State's proffer, the trial court held that it would allow the State to "call [Turner] as an expert in the field of forensic interviewing but would not be allowed to "lead her" or ask her "what happens when the child comes to court." Defense counsel objected to Turner "being called for the record" because she did not think Turner's

- 16 -

testimony "was relevant." The trial court stated that Turner's testimony as an expert was relevant because there had been testimony that the child's disclosure during the forensic interview "was different from his testimony in court." The court said "the jury . . . ought to have a right to see the forensic interview, but I certainly think they have a right to know what a forensic interview is[,]" which was why it was allowing Sydni Turner to testify as an expert. Defense counsel immediately argued that allowing Turner to testify without admitting the forensic interview was "highly prejudicial[,]" "[m]isleading[,]" and "confusing to the jury." The trial court replied that while Turner's testimony was "worthless pretty much in terms of telling them anything about this testimony[,]" it felt that Turner's testimony was "helpful" in letting the jury "know what a forensic interview is." The defense then asserted that Turner's proposed testimony improperly "bolster[ed] the child's statement" and was "inappropriate the way it's being done." The State denied that Turner's testimony bolstered the child's statement and that "if anything[,]" Turner's testimony just "educate[d] the jury on how to assess testimony that has been presented to them[.]" The trial court asserted that it was not allowing Turner to testify "to help the jury evaluate this child's testimony today" and instead was allowing Turner to testify so the jury "will know what the circumstances were when [the child] made the other statement [during the forensic interview.]" The defense also objected on the ground that the limitations of Turner's expertise prevented her from being qualified to testify about P.B.'s story changing over time, and the State assured the defense that it would not ask Turner about that topic. Then the trial court and defense counsel had the following exchange:

Trial Court: . . . I'm not sure I'd call [Turner] if I were the State, but I'm not the State. I can think of lots of questions that I would ask [Turner] if I were the defense attorney, but, here again, why not let the jury see the interview.

Defense Counsel: I think evidentiary there are some issues there. If you overrule me–

Trial Court: I'm not overruling you. I'm offering.

Defense Counsel: I think if [Turner] is going to testify then [admission of the forensic interview] is the only way to do it.

The defense argued that Turner's proffered testimony made it sound "like somebody told the kid not to tell about this" but that the forensic interview recording showed that the child's statement of "My mom said not to tell" was "not even contemporaneous with the discussion about what happened at the theater[.]" The defense also asserted that Turner's testimony "discounts a prior inconsistent statement that we were able to get in[,]" which the defense claimed was "prejudicial." The trial court said, "I note your objection," and

then asked, "Now, do you want the forensic interview in? Do you want to make that decision after you've heard from her?" Defense counsel replied, "No. I think if you let [Turner] in[,] you let the [forensic] interview in." Defense counsel repeated, "I don't want [Turner] to come in," and when the trial court stated that Turner would, in fact, be allowed to testify, then defense counsel reiterated that "the only way to do it" would be to also admit the forensic interview because otherwise it would be "far too confusing to a jury." The trial court agreed that the forensic interview would also be admitted if Turner testified, and the State confirmed that it still wanted Turner to testify as an expert. The trial court said the State would be allowed to have Turner testify as an expert and could ask her questions about the different types of disclosures or non-disclosures that can happen in a forensic interview and about the risk factors that can produce those types of disclosures. When the trial court again sought confirmation that the defense wanted the forensic interview admitted if Turner testified, defense counsel replied, "This is all over my objection, but, yes. If she's testifying I think the only way you do it is with the interview." The trial court then held that the State could ask Turner about her involvement with the forensic interview, lay the foundation for the interview, play the recording of the forensic interview in full, qualify Turner as an expert in the field of forensic interviewing, and then ask Turner about the particulars of the interview.

At the hearing on the motion for new trial, the Defendant argued that the trial court "erred in qualifying Sydni Turner as an expert in forensic interviewing." He argued that while Turner's "credentials showed that she had conducted many, many forensic interviews," she had "more or less only the basic training or qualifications required as a forensic interviewer." He also argued that although the trial court limited Turner's testimony to "the forensic interviewing process," Turner actually testified at the end that P.B. "was a reluctant child[,]" but she never gave "any basis or explanation for that opinion."

Our review of the record shows the trial court recognized that Sydni Turner's testimony was inadmissible to bolster P.B.'s credibility. Nevertheless, it appears that the court allowed Turner to testify after determining that the defense "opened the door" to this evidence by eliciting testimony from Detective Mitchell about P.B.'s prior inconsistent statement during the forensic interview. "'[O]pening the door' is an equitable principle that permits a party to respond to an act of another party by introducing otherwise inadmissible evidence." State v. Vance, 596 S.W.3d 229, 250 (Tenn. 2020). "[T]he remedy sought after a party has opened the door should be both relevant and proportional," and "the otherwise inadmissible evidence sought to be introduced by the opposing party should be limited to that necessary to correct a misleading advantage created by the evidence that opened the door." Id. at 250-51. Because the issue in this case concerns expert testimony regarding the characteristics of child victims of sexual abuse, we are

- 18 -

guided by authorities specifically addressing this narrow issue rather than the more general principle of "opening the door" to this evidence.

In resolving the issue regarding the admissibility of Sydni Turner's expert testimony, we recognize that determinations regarding the qualifications, admissibility, relevance, and competence of expert testimony fall within the broad discretion of the trial court and will be overturned only for an abuse of that discretion. State v. Davidson, 509 S.W.3d 156, 208 (Tenn. 2016) (citing McDaniel v. CSX Transp., Inc., 955 S.W.2d 257, 263-64 (Tenn. 1997); State v. Scott, 275 S.W.3d 395, 404 (Tenn. 2009)). "A trial court abuses its discretion when it applies incorrect legal standards, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party." Scott, 275 S.W.3d at 404-05 (citing Konvalinka v. Chattanooga-Hamilton Cnty. Hosp. Auth., 249 S.W.3d 346, 358 (Tenn. 2008)).

Rule 702 of the Tennessee Rules of Evidence, which governs the admissibility of expert testimony, provides: "If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." Tenn. R. Evid. 702. In order to uphold the admission of expert testimony, the following four factors must appear in the record:

(1) The witness must be an expert;
(2) The subject matter of the witness' testimony must be proper;
(3) The subject matter must conform to a generally-accepted explanatory theory; and
(4) The probative value of the witness' testimony must outweigh its prejudicial effect.

State v. Anderson, 880 S.W.2d 720, 728 (Tenn. Crim. App. Jan. 20, 1994).

Several published cases provide insight on whether the trial court abused its discretion in allowing Turner to provide expert testimony in this case. In State v. Ballard, 855 S.W.2d at 561-63, the Tennessee Supreme Court held that the admission of an expert's testimony, which explained the symptoms of post-traumatic stress syndrome exhibited by victims of child sexual abuse and concluded that the child victims in that case exhibited the aforementioned symptoms, was reversible error. The expert asserted that there were groups or "constellations" of symptoms upon which he relied to make a diagnosis and that the behavior traits attributed to the child victims in that case, upon which he concluded that the victims had been sexually abused, were "bed-wetting, clinging, fear (specifically fear

of water and sharks for one child), irritability, nightmares, anxiety and discipline problems at school." Id. at 561. The court explained:

> In the context of a criminal trial, expert scientific testimony solicits the danger of undue prejudice or confusing the issues or misleading the jury because of its aura of special reliability and trustworthiness. This "special aura" of expert scientific testimony, especially testimony concerning personality profiles of sexually abused children, may lead a jury to abandon its responsibility as fact finder and adopt the judgment of the expert. Such evidence carries strong potential to prejudice a defendant's cause by encouraging a jury to conclude that because the children have been identified by an expert to exhibit behavior consistent with post-traumatic stress syndrome, brought on by sexual abuse, then it is more likely that the defendant committed the crime. Testimony that children exhibit symptoms or characteristics of post-traumatic stress syndrome should not suffice to confirm the fact of sexual abuse. The symptoms of the syndrome are "not like a fingerprint in that it can clearly identify the perpetrator of a crime." Expert testimony of this type invades the province of the jury to decide on the creditability of witnesses.

Id. at 561-62 (citations omitted). Ultimately, the court held that "because no consensus exists on the reliability of a psychological profile to determine abuse, expert testimony describing the behavior of an allegedly sexually abused child is not reliable enough to 'substantially assist' a jury in an inquiry of whether the crime of child sexual abuse has taken place." Id. at 562 (citing Tenn. R. Evid. 702).

A few years later, in State v. Anderson, 880 S.W.2d at 730, the Tennessee Court of Criminal Appeals held that the admission of expert testimony from a licensed clinical social worker regarding characteristics, specifically recantation, believed to be typical among child victims of sexual abuse was reversible error. The expert, Bonnie Beneke, testified in rebuttal that while sometimes child victims disclose abuse but then recant because the abuse never occurred, there was also a common "predictable phenomenon" in which the child victim discloses the abuse, recants when the child does not get the response that they hoped, and then reaffirms that the abuse occurred. Id. at 724. She also stated that in cases where the abuse never occurred, the child victim was "absolutely not" likely to recant and then reaffirm that the abuse actually occurred. Id. at 725-26. The court evaluated the evidence presented before determining that the only value of this expert's testimony was to accredit the trial testimony of the victim:

> Here, the [S]tate's case rests entirely upon the credibility of the child victim, an alert, intelligent eight year old with a good command of our

language. During direct examination, however, the victim admitted that he had told several of his relatives that he had made up the story before reasserting that his denials were untruthful. Ms. Beneke did not examine the child but testified that children who are sexually abused often recant their allegations. Ms. Beneke described recantation as "very common" and "a predictable phenomena" when children have been sexually abused. Finally, she asserted that child victims making false allegations of sexual abuse were "absolutely not" likely to reaffirm their initial claim after a recantation. The only possible value of these comments, in the context of the trial, was to accredit the testimony of the victim. The opinion of the expert fit to perfection the theory of the state.

Id. at 730. The court concluded that "despite the expert's acknowledgment that a recantation can take place because the original allegation of abuse was false and despite the trial court's contemporaneous instruction to the jury that the evidence was only 'to inform the jury of this [recantation] phenomenon,' we must find that the overall prejudicial effect outweighed the probative value of the testimony." Id. (alternation in original). It noted that "if the [expert] testimony were not introduced by the state as a means of bolstering the child victim's testimony, it would have had no probative value at all." Id. (citing D. Paine, Tennessee Law of Evidence, § 220 (1974)).

Still later in State v. Bolin, 922 S.W.2d at 873-75, the Tennessee Supreme Court held that while it was error for the trial court to admit a social worker's testimony that included the general statement that young victims of repeated sexual abuse often have trouble remembering when specific events of abuse, such error was harmless because it did not affect the judgment. In concluding that the trial court's error was not prejudicial to the defendant, the court stated:

> We find . . . that the defendant construes the social worker's testimony too broadly. The testimony essentially consists of an explanation of a narrow issue—why K.N. could not assign reasonably specific time or dates to any of the alleged events of sexual abuse. Therefore, the testimony does not, unlike the testimony in Ballard, purport to completely vouch for the overall credibility of the victim, and thus it cannot be said to have "explained away" the inconsistencies and recantations—the heart of the defense theory. Hence, the damaging effect of the testimony is minimal.
>
> Moreover, the likelihood that the error could have affected the judgment is slight in view of the entire record. While there was no conclusive medical evidence that K.N. had been abused, neither did the medical evidence rule out the possibility of abuse. K.N. related episodes of sexual

abuse to three different parties—the teacher, the social worker, and Dr. Colburn—over a period of several weeks or months. Furthermore, her older brother witnessed improper sexual contact occurring between the defendant and K.N. Aside from the recantation—for which a reasonable explanation was offered—the only possible inconsistencies in K.N.'s stories that we can glean from the record are that she did not mention any oral sex during the first interviews, but revealed this information at a later time; and that she told Dr. Colburn that she had not been abused when in fact she had possibly been abused some years ago by an eleven year old boy. In summation, the evidence of the defendant's guilt is strong; this is not a case where the only evidence of the defendant's guilt is the unsubstantiated testimony of the alleged victim.

Id. at 874-75 (footnote omitted).

The Defendant asserts that Turner's testimony only served to bolster the credibility of P.B. and that if it was not offered for this purpose, then it would be "plainly irrelevant." He cites to Turner's testimony that the three-week delay between the alleged incident and the forensic interview was "not the best practice," that delays like this might affect a child's willingness to talk about the abuse allegations, and that P.B.'s statement was a "reluctant disclosure." He also references the fact that Turner's testimony described the various reasons why a child might recant an earlier disclosure.

Here, Turner provided expert testimony regarding the characteristics, including partial disclosures and recantation, that are common among child victims of sexual abuse. The record shows that the primary purpose of Sydni Turner's testimony was to accredit P.B.'s trial testimony, that the Defendant actually touched his penis, over the P.B.'s statement during the forensic interview, that the Defendant asked to touch but never actually touched his penis. Because Turner's testimony was closely related to testimony concerning child sexual abuse syndrome that was expressly prohibited in Ballard, we conclude that admission of Turner's expert testimony was error. See Bolin, 922 S.W.2d at 874.

However, we must next consider whether the admission of Turner's expert testimony was harmless. The Defendant bears the burden of establishing that the "admission of this evidence more probably than not affected the verdict or resulted in prejudice to the judicial process." State v. Rodriguez, 254 S.W.3d 361, 372 (Tenn. 2008); see Tenn. R. App. P. 36(b) ("A final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice

- 22 -

to the judicial process."). The Defendant argues that Turner's testimony was not harmless because it bolstered P.B.'s testimony at trial concerning the details of the incident.

Unlike Anderson, this is not a case where the testimony of an alleged victim is the only evidence of the Defendant's guilt. The proof at trial established that P.B. told his mother and Officer Whitney and testified at trial that the Defendant touched his penis in the theater bathroom. The only inconsistent disclosure made in the forensic interview was that P.B. omitted any mention of the Defendant touching his penis, although P.B. did state that the Defendant asked if he could touch P.B.'s penis. Here, the Defendant was charged with and convicted of attempted aggravated sexual battery, which does not require a completed offense. The jury heard Detective Mitchell's testimony about P.B.'s prior inconsistent statement and then saw the recording of P.B.'s forensic interview in its entirety. The jury also saw the recording of the Defendant's statement to police just four days after the incident, wherein the Defendant initially claimed he was on vacation in New Jersey the night of the incident before finally admitting that he had some sort of interaction with P.B. in the bathroom at the theater on July 1, 2016. The jury also watched the theater's surveillance video, which showed the Defendant pacing back and forth while talking on his cell phone before hurriedly leaving the theater with the Granims children immediately after P.B. reported the incident and before the movie the Defendant and the Granims children had concluded. This surveillance video also depicted the Defendant wearing sunglasses inside the theater's lobby as he went back to gather the Granims children so they could leave the theater that night. Both Sherry and Mark Crooks testified that the Defendant looked "concerned" before he gathered the Granims children and quickly left the theater. Therefore, the evidence of the Defendant's guilt, which consisted of both direct and circumstantial proof, was substantial. This is simply not a case where the only evidence of the Defendant's guilt was "the unsubstantiated testimony of the alleged victim." Bolin, 922 S.W.2d at 875 (footnote omitted). While the trial court's admission of Sydni Turner's expert testimony was error, we conclude that this error was harmless because the Defendant has failed to show that admission of this evidence more probably that not affected the verdict or resulted in prejudice to the judicial process. Accordingly, the Defendant is not entitled to relief on this issue.

**II. Admission of Forensic Interview as Substantive Evidence.** The Defendant also argues that the trial court abused its discretion in admitting P.B.'s forensic interview as substantive evidence. First, he claims that the trial court failed to comply with the procedural requirements of Code section 24-7-123, which governs the admissibility of forensic interviews. Second, he asserts that the State's proferred theory of admissibility, namely a prior inconsistent statement, fails because none of the requirements of Tennessee Rules of Evidence 613 and 803(26) were satisfied. Third, he contends "to the extent that some of the forensic interview involved prior consistent statements of P.B., such hearsay was still inadmissible because the trial court failed to make the necessary findings and

- 23 -

failed to give the required limiting instruction." Accordingly, the Defendant maintains that there was no legal basis to admit the forensic interview. In response, the State asserts that the Defendant waived plenary review of this issue by failing to object to the forensic interview's admission at trial and that the Defendant is not entitled to plain error relief. We conclude that the Defendant did not waive this issue. We also conclude that while the trial court erred in admitting the forensic interview, the error is harmless because the forensic interview supported the defense theory of the case and there was substantial evidence of the Defendant's guilt presented at trial.

Despite the State's argument to the contrary, a close reading of the trial transcript shows that the defense objected not only to Sydni Turner's expert testimony but also admission of the recording of the forensic interview. Accordingly, the Defendant has not waived this issue, and we will address it on the merits.

At the hearing on the motion for new trial, the Defendant argued that the trial court erred in admitting the forensic interview because the interview was "inadmissible hearsay" and was not admissible pursuant to Code section 24-7-123.

Tennessee Code Annotated section 24-7-123 allows for the admissibility as substantive evidence of a video recording of a forensic interview of a child under the age of thirteen where the child describes any act of sexual contact performed with or on the child by another if certain requirements are met. Tenn. Code Ann. § 24-7-123(a). The interview "may be considered for its bearing on any matter to which it is relevant evidence at the trial" of the defendant." Id. Pursuant to this statute, the video recording "may" be admitted if:

> (1) The child testifies, under oath, that the offered video recording is a true and correct recording of the events contained in the video recording and the child is available for cross examination;
>
> (2) The video recording is shown to the reasonable satisfaction of the court, in a hearing conducted pretrial, to possess particularized guarantees of trustworthiness. In determining whether a statement possesses particularized guarantees of trustworthiness, the court shall consider the following factors:
>
> (A) The mental and physical age and maturity of the child;
> (B) Any apparent motive the child may have to falsify or distort the event, including, but not limited to, bias or coercion;
> (C) The timing of the child's statement;
> (D) The nature and duration of the alleged abuse;

(E) Whether the child's young age makes it unlikely that the child fabricated a statement that represents a graphic, detailed account beyond the child's knowledge and experience;

(F) Whether the statement is spontaneous or directly responsive to questions;

(G) Whether the manner in which the interview was conducted was reliable, including, but not limited to, the absence of any leading questions;

(H) Whether extrinsic evidence exists to show the defendant's opportunity to commit the act complained of in the child's statement;

(I) The relationship of the child to the offender;

(J) Whether the equipment that was used to make the video recording was capable of making an accurate recording; and

(K) Any other factor deemed appropriate by the court;

(3) The interview was conducted by a forensic interviewer who met the following qualifications at the time the video recording was made, as determined by the court:

(A) Was employed by a child advocacy center that meets the requirements of § 9-4-213(a) or (b); provided, however, that an interview shall not be inadmissible solely because the interviewer is employed by a child advocacy center that:

(i) Is not a nonprofit corporation, if the child advocacy center is accredited by a nationally recognized accrediting agency; or

(ii) Employs an executive director who does not meet the criteria of § 9-4-213(a)(2), if the executive director is supervised by a publicly elected official;

(B) Had graduated from an accredited college or university with a bachelor's degree in a field related to social service, education, criminal justice, nursing, psychology or other similar profession;

(C) Had experience equivalent to three (3) years of fulltime professional work in one (1) or a combination of the following areas:

(i) Child protective services;

(ii) Criminal justice;

(iii) Clinical evaluation;

(iv) Counseling; or

(v) Forensic interviewing or other comparable work with children;

(D) Had completed a minimum of forty (40) hours of forensic training in interviewing traumatized children and fifteen (15) hours of continuing education annually;

(E) Had completed a minimum of eight (8) hours of interviewing under the supervision of a qualified forensic interviewer of children;

(F) Had knowledge of child development through coursework, professional training or experience;
(G) Had no criminal history as determined through a criminal records background check; and
(H) Had actively participated in peer review;

(4) The recording is both visual and oral and is recorded on film or videotape or by other similar audiovisual means;
(5) The entire interview of the child was recorded on the video recording and the video recording is unaltered and accurately reflects the interview of the child; and

(6) Every voice heard on the video recording is properly identified as determined by the court.

Id. § 24-7-123(b). The trial court must make specific findings of fact on the record explaining its ruling regarding the admissibility of the forensic interview. Id. § 24-7-123(d). In addition, the recording of the forensic interview shall not become a public record in any legal proceeding, and the trial court shall order the recording to be sealed and preserved at the conclusion of the trial. Id. § 24-7-123(e).

"Generally, the admissibility of evidence rests within the trial court's sound discretion, and the appellate court does not interfere with the exercise of that discretion unless a clear abuse appears on the face of the record." State v. Franklin, 308 S.W.3d 799, 809 (Tenn. 2010) (citing State v. Lewis, 235 S.W.3d 136, 141 (Tenn. 2007)). A trial court is found to have abused its discretion when it applies "an incorrect legal standard or reaches a conclusion that is 'illogical or unreasonable and causes an injustice to the party complaining.'" Lewis, 235 S.W.3d at 141 (quoting State v. Ruiz, 204 S.W.3d 772, 778 (Tenn. 2006)).

First, the Defendant contends that the trial court failed to hold the required pretrial hearing and failed to make any of the findings necessary to admit the forensic interview under Code section 24-7-123. He argues not only that P.B. failed to testify that the forensic interview was "true and correct" under Code section § 24-7-123(b)(1) but also that P.B. failed to testify about the recording of his forensic interview at all. In addition, the Defendant asserts that the trial court never held that the recording of the forensic interview had "particularized guarantees of trustworthiness." Tenn. Code Ann. § 24-7-123(b)(2). Moreover, he contends that although Sydni Turner mentioned some of her qualifications as a forensic interviewer, the trial court never determined that Turner met the requirements of Code section 24-7-123(b)(3). Lastly, he argues that the trial court failed to "make specific findings of fact, on the record, as to the basis for its ruling . . . ." Id. § 24-7-123(d).

We agree with the Defendant that the trial court never made the findings required by Code sections 24-7-123(b)(1), (b)(2), (b)(3), and (d) that are required in order for a recording of a forensic interview to be admissible as substantive evidence.

Second, the Defendant insists that forensic interview is inadmissible as a prior inconsistent statement because the trial court failed to make the necessary findings for it to be admitted as such. The Defendant asserts that the State failed to call P.B. to give him an opportunity to explain or deny the prior statement. He also asserts that the trial court failed to make a finding that the prior statement "was made under circumstances indicating trustworthiness." Tennessee Rule of Evidence 613(b) provides that "[e]xtrinsic evidence of a prior inconsistent statement by a witness is not admissible unless and until the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require." Tenn. R. Evid. 613(b). When a witness testifies inconsistently with a previous statement, that witness's testimony may be impeached with the prior inconsistent statement. Id. However, extrinsic evidence of a prior inconsistent statement is inadmissible unless the witness denies making the statement or equivocates about making it. State v. Martin, 964 S.W.2d 564, 567 (Tenn. 1998). In order to be admissible as substantive evidence under Tennessee Rule of Evidence 803(26), the statement must first be admissible as a prior inconsistent statement under Rule 613(b). Tenn. R. Evid. 803(26). However, the trial transcript in this case shows that P.B. was never afforded an opportunity to explain or deny the statement he gave during the forensic interview. Accordingly, because the recording of the forensic interview did not qualify for admission under Rule 613(b), it was also not admissible as substantive evidence under Rule 803(26).[3]

Third, the Defendant maintains that the recording of the forensic interview was also not admissible as a prior consistent statement. He claims "the trial court failed to make any findings suggesting that P.B.'s credibility was attacked in such a manner as to open the door for the admission of a prior consistent statement" and that even if it had, the court

---

[3] At the conclusion of all the proof, the trial court provided the following instruction, in pertinent part, that is consistent with the pattern jury instruction 42.04(b):

> Another factor for you to consider in evaluating a witness' testimony is whether the witness has made material statements at some point before he or she testified that are different from his or her testimony at trial. In that regard, however, proof of any prior different statement may be considered by you only for the purpose of determining if the witness is telling the truth at trial. The contents of the prior inconsistent statement are not to be considered as proof in the trial.

See 7 Tenn. Prac. Pattern Jury Instr. T.P.I.–Crim. 42.04(b). This instruction seems to indicate that the trial court intended the recording of the forensic interview to be considered by the jury for impeachment purposes rather than as substantive evidence.

"erred by failing to give a limiting instruction explaining that the prior statement was only to be considered for a limited purpose." While prior consistent statements of a witness generally are not admissible to bolster the witness's credibility, "prior consistent statements may be admissible . . . to rehabilitate a witness when insinuations of recent fabrication have been made, or when deliberate falsehood has been implied." State v. Benton, 759 S.W.2d 427, 433 (Tenn. Crim. App. 1988). Because the record shows that the forensic interview was not admitted for the purpose of rehabilitating P.B., we agree that the forensic interview was not admissible on this basis.

If anything, the admission of the forensic interview, which supported the defense's theory that the Defendant never touched P.B.'s intimate parts, was part of a brokered deal by the trial court in response to the State's request to have Sydni Turner provide expert testimony. However, because there does not appear to be any legal basis to admit the forensic interview, we conclude that the trial court's admission of it was error.

We must next consider whether the admission of the recording of the forensic interview was harmless. As we previously noted, the Defendant must show that the "admission of this evidence more probably than not affected the verdict or resulted in prejudice to the judicial process." Rodriguez, 254 S.W.3d at 372; see Tenn. R. App. P. 36(b). In making the determination regarding harmlessness, we recognize that the admission of the forensic interview had the practical effect of emphasizing the defense theory that P.B.'s trial testimony was not credible and that the prior inconsistent statement made by P.B. during the forensic interview, namely that the Defendant never touched his penis, was the truth. Therefore, we conclude that while the trial court's admission of forensic interview was error, this error was harmless because the Defendant has failed to show that admission of this evidence more probably that not affected the verdict or resulted in prejudice to the judicial process. Accordingly, the Defendant is also not entitled to relief on this issue.

**III. Flight Instruction.** The Defendant argues that the trial court erred in giving the instruction on flight because there was insufficient proof that he was "hiding out" or evading detection. He claims that the only evidence of "hiding out" was presented by Detective Mitchell, who testified that the Defendant did not own the house he was living in and did not have any utilities in his name but also testified that the Defendant was located the same day the investigation began and voluntarily agreed to be interviewed. The Defendant insists that living in a home he did not own and not having any utility bills in his name is not enough to show that he was "hiding out" and that "if it were sufficient, nearly all renters with roommates would be subject to a flight instruction simply because they returned home from the scene of an alleged incident." In response, the State contends that the Defendant waived plenary review on this issue by failing to make a contemporaneous objection to the flight instruction on the record and that the Defendant is

not entitled to plain error relief. We conclude that although the Defendant is entitled to plenary review, he is not entitled to relief because there was sufficient evidence to support the flight instruction.

The record shows that in a hearing out of the presence of the jury after the close of all evidence, the following exchange occurred:

Trial Court:        What about instructions?

Defense Counsel:   Instructions?

Trial Court:        I am going to give the flight instruction.

State:             Thank you.

At the time, defense counsel never raised a contemporaneous objection to the instruction.

Thereafter, the trial court gave the following instruction on flight:

The flight of a person accused of a crime is a circumstance which, when considered with all the facts of the case, may justify an inference of guilt. Flight is the voluntary withdrawal of oneself for the purpose of evading arrest or prosecution for the crime charged. Whether the evidence presented proves beyond a reasonable doubt that the defendant fled is a question for your determination.

The law makes no precise distinction as to the manner or method of flight; it may be open, or it may be a hurried or concealed departure, or it may be a concealment within the jurisdiction. However, it takes both a leaving the scene of the difficulty and a subsequent hiding out, evasion, or concealment in the community, or a leaving of the community for parts unknown, to constitute flight.

If flight is proved, the fact of flight alone does not allow you to find that the defendant is guilty of the crime alleged. However, since flight by a defendant may be caused by a consciousness of guilt, you may consider the fact of flight, if flight is so proven, together with all of the other evidence when you decide the guilt or innocence of the defendant. On the other hand, an entirely innocent person may take flight and such flight may be explained by proof offered, or by facts and circumstances of the case.

- 29 -

Whether there was flight by the defendant, the reasons for it, and the weight to be given to it, are questions for you to determine.[4]

See 7 Tenn. Prac. Pattern Jury Instr. T.P.I.—Crim. 42.18. This flight instruction has been cited with approval by this court. See State v. Kendricks, 947 S.W.2d 875, 885-86 (Tenn. Crim. App. 1996) (citing State v. Payton, 782 S.W.2d 490, 497-98 (Tenn. Crim. App. 1989); State v. Whittenmeir, 725 S.W.2d 686, 688 (Tenn. Crim. App. 1986)). The trial court, after reading the complete written charge to the jury, asked if there were any requests for additional instructions or corrections to the instructions, and both parties responded negatively.

At the hearing on the motion for new trial, defense counsel made the following arguments regarding the flight instruction:

Flight. That was taken up in the conference that morning before trial that was not recorded and is not part of that record, although it does come up later in a reference. I think that the Court refers to my objection and says "I'm going to give this instruction anyway." We argued against that instruction that morning and the basis for our argument was that flight requires both a . . . "[l]eaving the scene of the difficulty and a subsequent hiding out, evasion or concealment in the community or a leaving of the community for parts unknown to constitute flight."

The State made an argument through questioning, I believe, of Dennis Mitchell that [the Defendant] going to his house satisfied the second prong of that requirement. There was some discussion of . . . the house not being in [the Defendant's] name and the utilities not being in [the Defendant's] name, but, basically, the proof showed that [the Defendant] was easily found with some basic police investigation. They probably could have done it even more easily by getting [the Defendant's] bank information from his credit card which they had, but the burden was not met regarding a subsequent hiding out, evasion or concealment in the community or leaving the community for parts unknown.

While the Defendant claims that defense counsel lodged a contemporaneous objection to the proposed flight instruction off the record, the record shows only that a discussion regarding the flight instruction may have occurred, not that the defense objected to such an instruction. However, "[a]n erroneous or inaccurate jury charge, as opposed to

---

[4] Although this flight instruction was not included in the trial transcript, it was included in the jury charge in the technical record.

- 30 -

an incomplete jury charge, may be raised for the first time in a motion for a new trial and is not waived by the failure to make a contemporaneous objection." State v. Faulkner, 154 S.W.3d 48, 58 (Tenn. 2005).

Accordingly, we must next consider whether the Defendant waived this issue by failing to include the transcript from any such discussion about the flight instruction in the record on appeal. The appellant has a duty to prepare a record that conveys "a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal." Tenn. R. App. P. 24(b). "Where . . . the record is incomplete, and does not contain a transcript of the proceedings relevant to an issue presented for review, or portions of the record upon which a party relies, this Court is precluded from considering the issue." State v. Roberts, 755 S.W.2d 833, 836 (Tenn. Crim. App. 1998) (citing State v. Groseclose, 615 S.W.2d 142, 147 (Tenn. 1981); State v. Jones, 623 S.W.2d 129, 131 (Tenn. Crim. App. 1981)). "In the absence of an adequate record on appeal, we must presume that the trial court's ruling was supported by the evidence." State v. Bibbs, 806 S.W.2d 786, 790 (Tenn. Crim. App. 1991) (citing Smith v. State, 584 S.W.2d 811, 812 (Tenn. Crim. App. 1979); Vermilye v. State, 584 S.W.2d 226, 230 (Tenn. Crim. App. 1979)). Although the Defendant risked waiving this issue by failing to include all parts of the record pertaining to the flight instruction, including whatever transpired during the alleged off-the-record conference, we will nevertheless review this issue on the merits.

A defendant in a criminal case has a constitutional right to a correct and complete charge of the law, so that each issue of fact raised by the proof will be submitted to the jury on proper instructions. State v. Dorantes, 331 S.W.3d 370, 390 (Tenn. 2011) (citing Faulkner, 154 S.W.3d at 58; State v. Farner, 66 S.W.3d 188, 204 (Tenn. 2001); State v. Garrison, 40 S.W.3d 426, 432 (Tenn. 2000)). The trial court "must instruct the jury on those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case." State v. Elder, 982 S.W.2d 871, 876 (Tenn. Crim. App. 1998). Because challenges to jury instructions present mixed questions of law and fact, we review challenged instructions de novo without a presumption of correctness. State v. Smith, 492 S.W.3d 224, 245 (Tenn. 2016).

"In order for a trial court to charge the jury on flight as an inference of guilt, there must be sufficient evidence to support such instruction." State v. Berry, 141 S.W.3d 549, 588 (Tenn. 2004). Sufficient evidence supporting a flight instruction exists where there is evidence of "both a leaving the scene of the difficulty and a subsequent hiding out, evasion, or concealment in the community, or a leaving of the community for parts unknown." State v. Burns, 979 S.W.2d 276, 289-90 (Tenn. 1998) (citation and internal quotation marks omitted). The State may satisfy the subsequent hiding out, evasion, or concealment requirement by presenting proof from which a jury might infer that the defendant committed such acts. Rogers v. State, 455 S.W.2d 182, 186-87 (Tenn. Crim. App. 1970)).

A defendant's brief evasion of authorities is sufficient to support the giving of an instruction on flight. Payton, 782 S.W.2d at 498. "Evidence of flight to avoid arrest may be rebutted by a credible explanation of some motive other than guilt, but the conclusion to be drawn from such evidence is for the jury upon proper instructions from the trial court." Hall v. State, 584 S.W.2d 819, 821 (Tenn. Crim. App. 1979).

We conclude that there was sufficient evidence presented at trial to support the jury instruction on flight. The proof showed that the Defendant quickly left the crime scene, evaded police, and concealed himself for approximately four days until the police found him. Mark Crooks testified that on July 1, 2016, he saw the Defendant reenter the theater, collect the children with him, and leave "before any police arrived." Sherry Crooks testified that just after P.B. reported the offense, the Defendant, along with the children he had brought, left before the movie they were watching ended, which she thought was odd. She also said the Defendant appeared "concerned" and "in a hurry" as he left the theater. The theater's surveillance video recording shows the Defendant leaving within three minutes of the crime being reported to the theater owners and shows the Defendant wearing sunglasses inside the theater as he gathered the Granims children before leaving. Detective Mitchell testified that the Defendant lived in a house he did not own and did not have any utilities in his name. Both Detective Mitchell and Detective Blurton testified that on July 5, 2016, they located the Defendant's vehicle at a home on Shepard Street using his driver's license and license plate information. The detectives found the Defendant at that home and brought him to the police station for an interview.

We conclude that the defendant's actions in fleeing the crime scene, evading police, and concealing himself for approximately four days are sufficient evidence to support the trial court's decision to provide the instruction on flight. See State v. Smith, 893 S.W.2d 908, 918 (Tenn. 1994) (concluding there was circumstantial evidence of an immediate flight because the proof raised a reasonable inference that the defendant had seen the flashing lights of a police car that was responding to another call nearby, left the scene, and concealed himself in the community); State v. Markist Kantrell Cole, No. W2019-00079-CCA-R3-CD, 2020 WL 1547845, at *12 (Tenn. Crim. App. Apr. 1, 2020) (concluding that the trial court properly instructed on flight when the evidence showed that the Defendant left the scene, disposed of the murder weapon, and remained concealed for two days before turning himself into the authorities). The specific instruction given in this case stated that "an entirely innocent person may take flight" and that "[w]hether there was flight by the defendant, the reasons for it, and the weight to be given to it, are questions for you to determine." See Smith, 893 S.W.2d at 918; State v. Richardson, 995 S.W.2d 119, 129 (Tenn. Crim. App. Aug. 13, 1998). This instruction allowed the jury to infer guilt from flight but also allowed the jury to hear the Defendant's explanation for his actions and determine that he was innocent. See Kendricks, 947 S.W.2d at 886. Although the defense theory at trial was that the Defendant left the theater early because he was ill, the jury

clearly rejected this theory and inferred the Defendant's guilt upon considering the Defendant's abrupt departure from the theater along with the aforementioned facts and circumstances in this case. Because there was sufficient evidence that the Defendant left the scene, evaded the police, and concealed himself in the community, the trial court properly instructed the jury on flight, and the Defendant is not entitled to relief.

**IV.** **Prosecutorial Misconduct During Closing Argument.** The Defendant contends that the State made two improper comments during its closing argument. He asserts that the State's first comment constitutes a non-structural constitutional error that requires reversal because it violated his constitutional right to remain silent under the test in State v. Jackson, 444 S.W.3d 554 (Tenn. 2014). He claims the State's second comment, wherein the prosecutor improperly used the position and experience of the District Attorney's office to challenge the Defendant's credibility by stating that sexual offenders do not generally admit their guilt, does not implicate a constitutional right but nevertheless requires reversal. The Defendant additionally argues that these errors, taken individually or together, require reversal. In response, the State contends that the Defendant waived review of his claim that the State improperly commented on his right to remain silent. The State also argues the Defendant failed to show that the State's second comment was so impermissibly prejudicial that a new trial is appropriate. We conclude that the Defendant is not entitled to relief regarding either of these comments.

During the State's initial closing argument, the prosecutor played a portion of the theater's surveillance video that had been entered into evidence. The prosecutor then made the first statement challenged by the Defendant:

> I'm going to pause [the surveillance video] right here. It's a little hard to see sometimes. You saw this in our case in chief, this video, and I want you to know—of course, you know the times are off and a day forward, but given all that, look especially at how long it was between events. This happened. This is where the mom comes out and initially waves to Ms. Sherry [Crooks] and tells her to come over, they have something to tell her. At that point it is 6:56:19 according to this video. I'm just going to go with that for purposes of what we're doing. All right. Watch there. They're still talking to him and it's 6:56. It's 6:56:53. They're still giving that statement and they're still alerting them to what happened about [the Defendant] touching [P.B.'s] penis in the bathroom. If you notice there, [the Defendant]'s covering his face. I'm sure you noticed that. 6:57:15. At this point while this was going on it was presented to you that potentially [the Defendant] went back into the theatre. I wonder if he went really back into that theatre. You'll see why. Okay. So [P.B. and his mother] leave. Go back into the theatre. You saw that. It's 6:58:32 when that conversation

- 33 -

ended. Right there. 6:58:54. I said 6:58:32 [when the conversation between P.B. and his mother and the Crooks ended]. Note that. <u>That's how quick [the Defendant] was to come out from the time after they had made this report. We don't know if [the Defendant] was standing there listening. We don't know if he was in the theatre. Nobody can tell you that. Nobody did that here today. Only he knows that.</u>[5] He comes out and talks on the phone and walks around and, in my opinion, looking at it, to me he's nervous. He's pacing. 6:59:36 P.M. he's still outside on the phone. 7 o'clock. Ms. Sherry [Crooks] and Mr. Mark [Crooks] go out to go call the police. Y'all remember that. They just left. I wonder if he knew what they were going to do. 7:00:37. 7 o'clock and 39 seconds[.] Notice [the Defendant's] face when he comes back in. It's not bright in there. I wonder why he was covering that face. He didn't want anybody to see. He didn't want them to see him. He didn't want them to see him in the red shirt and the black shorts. Maybe he didn't want to see himself after what he did. 7:01:01. There he is. 7:01:16, leaving, fleeing, knowing potentially that that has just been reported and what he did was just told to the public and everybody knows and they're going to find out that it was him and so he leaves.

Later during this initial closing arguments, the prosecutor made the second challenged statement:

> You heard a limited amount of the Defendant's own statement that the gave to Officer Mitchell; limited for sure. You heard that he did admit that he went to the movies. He puts himself there. He puts himself in the bathroom. He puts himself in the bathroom with the boy. He puts himself in the bathroom with the boy [while he is wearing] the red shirt. <u>The only thing [the Defendant] won't admit to is what we convict him today. You don't just admit—my partner, General Scott, he tells me, "You don't just admit to sex crimes," you know. [General Scott] thinks it's easier to get an admission out of a murder case than it is a sex crime.</u>[6] That's just not something you want anybody to know about. So what did he admit to? He admitted to everything except what actually he did—what actually happened. In his words there was some kind of altercation. Yeah, there was, but it wasn't the kind that he described.

---

[5] The emphasized portion of the State's remarks is specifically challenged by the Defendant.
[6] Once again, the emphasized portion of the State's comments is challenged by the Defendant.

After the State concluded its initial closing argument, defense counsel approached the bench and objected to "statements made in closing arguments, for one, about the credibility of the witnesses." Defense counsel then stated, "Your Honor, we're objecting to the misstatement of evidence in that closing argument. One being that the Defendant admitted that he approached [P.B.]. That was never introduced. When the State denied making that statement, the parties and the trial court had the following exchange:

| | |
|---|---|
| Defense Counsel: | And the other thing is you can't express [your] personal belief or opinion as to the truth or a falsity or any testimony or the guilt of the Defendant and then I think she went outside [of] what she can do when she argued that—she inflamed the jury and when she said—. |
| The State: | Could we have a jury out? I can't hear you. |
| Defense Counsel: | I'm sorry. Maybe we should do that. |
| The State: | Could we have a jury out? |
| Trial Court: | No. Your objection is overruled. |

During the Defendant's closing argument, defense counsel directly addressed the first challenged comment by asserting, "[The State] say[s the Defendant] is guilty, that he must have done something wrong because he left the theatre early that night. Has anybody ever left an event early? I know I have. . . ." Later, defense counsel argued, "[The Defendant] left [the theater] because he wasn't feeling well because a child played an embarrassing trick on him in the bathroom."

Thereafter, the trial court, as a part of its final charge to the jury, provided the following instruction:

Nothing said or done by the lawyers who have tried this case is to be considered by you as evidence of any fact. Statements, arguments, and remarks of the lawyers are intended to help you in understanding the evidence and applying the law, but they are not evidence. If any statements were made that you believe are not supported by the evidence, you should disregard them.

See 7 Tenn. Prac. Pattern Jury Instr. T.P.I.–Crim. 1.07.

At the motion for new trial hearing, defense counsel asserted that she "absolutely objected" to the State's comments during its closing argument. She argued that there was "an improper statement regarding [the Defendant's] choice not to testify." She also asserted that the prosecutor's comment regarding sexual offenders generally not admitting their guilt was "improper argument regarding the falsity of evidence" that was "inflammatory."

We note that while the record shows that defense counsel contemporaneously objected to the State's second statement regarding offenders reluctance to admit to sex crimes, the defense failed to object to the first challenged statement that allegedly violated his right to remain silent. In his motion for new trial, the Defendant raised the general claim that the prosecutor made "improper arguments" during closing argument but never identified the specific instances of improper prosecutorial argument. However, at the hearing on the motion for new trial, the defense specifically identified the first and second comments outlined above and argued that they were improper. In State v. Hawkins, 519 S.W.3d 1, 48 (Tenn. 2017), the Tennessee Supreme Court applied plenary review rather than plain error review to two instances of allegedly improper prosecutorial argument that were included in the motion for new trial, despite the fact that the defendant failed to lodge a contemporaneous objection to these remarks at trial. See State v. Zackary James Earl Ponder, No. M2018-00998-CCA-R3-CD, 2019 WL 3944008, at *11 (Tenn. Crim. App. Aug. 21, 2019) (applying plenary review to the defendant's claim of improper closing argument where the defendant obtained a pretrial ruling precluding the State from expressing his personal opinion about the defendant and included this claim in his motion for new trial). We conclude that the Defendant is not entitled to relief under either plenary or plain error review.

Closing arguments function "to sharpen and to clarify the issues that must be resolved in a criminal case." State v. Banks, 271 S.W.3d 90, 130 (Tenn. 2008) (citing Herring v. New York, 422 U.S. 853, 862 (1975)). They also enable "the opposing lawyers to present their theory of the case and to point out the strengths and weaknesses in the evidence to the jury." Id. (citing Christian v. State, 555 S.W.2d 863, 866 (Tenn. 1977)). Because counsel in criminal cases "are expected to be zealous advocates," they should be afforded "great latitude in both the style and the substance of their arguments." Id. at 130-31. However, prosecutors "must not lose sight of their duty to seek justice impartially and their obligation 'to see to it that the defendant receives a fair trial.'" Hawkins, 519 S.W.3d at 47-48 (quoting Banks, 271 S.W.3d at 131). "[P]rosecutors 'may strike hard blows, [but they are] not at liberty to strike foul ones.'" Banks, 271 S.W.3d at 131 (quoting Berger v. United States, 295 U.S. 78, 88 (1935)). "'[I]mproper suggestions, insinuations, and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none.'" State v. Sexton, 368 S.W.3d 371, 419 (Tenn. 2012) (quoting Berger, 295 U.S. at 88). Consequently, "a prosecutor's closing

argument must be temperate, must be based on the evidence introduced at trial, and must be pertinent to the issues in the case." Banks, 271 S.W.3d at 131 (citing State v. Middlebrooks, 995 S.W.2d 550, 557 (Tenn. 1999); Russell v. State, 532 S.W.2d 268, 271 (Tenn. 1976)). "[P]rosecutors, no less than defense counsel, may use colorful and forceful language in their closing arguments, as long as they do not stray from the evidence and the reasonable inferences to be drawn from the evidence, or make derogatory remarks or appeal to the jurors' prejudices[.]" Id. (citations omitted). Prosecutors "must refrain from argument designed to inflame the jury[.]" State v. Hall, 976 S.W.2d 121, 158 (Tenn. 1998). In considering these two comments, we recognize that "[a] criminal conviction should not be lightly overturned solely on the basis of the prosecutor's closing argument." Banks, 271 S.W.3d at 131).

First, the Defendant argues that the prosecutor's first challenged remark constituted a non-structural constitutional error because it violated his right to remain silent under the test in Jackson, 444 S.W.3d at 588, 592. The Defendant asserts that this remark served to emphasize the fact that he did not testify at trial.

The United States and Tennessee constitutions protect a defendant's right to remain silent. U.S. Const. amend. V; Tenn. Const. art. I, § 9. "While closing argument is a valuable privilege that should not be unduly restricted, . . . comment upon a defendant's exercise of the state and federal constitutional right not to testify should be considered off limits to any conscientious prosecutor." Jackson, 444 S.W.3d at 590 (citations and internal quotation marks omitted). Both direct and indirect comments on a defendant's failure to testify can violate the Fifth Amendment privilege. Id. at 587.

The Tennessee Supreme Court outlined "a two-part test for ascertaining whether a prosecutor's remarks amount to an improper comment on a defendant's exercise of the constitutional right to remain silent and not testify." Id. at 587-88. Under this test, this court must consider: "(1) whether the prosecutor's manifest intent was to comment on the defendant's right not to testify; or (2) whether the prosecutor's remark was of such a character that the jury would necessarily have taken it to be a comment on the defendant's failure to testify." Id. at 588. Claims of impermissible prosecutorial comment on a defendant's right not to testify are reviewed de novo. Id. A prosecutor's comment on a defendant's right to remain silent is a non-structural constitutional error, and to avoid reversal, the State has the burden of establishing that the error is harmless beyond a reasonable doubt. Id. at 591. When determining whether the State has met its burden, this court "should consider the nature and extensiveness of the prosecutor's argument, the curative instructions given, if any, and the strength of the evidence of guilt." Id. (footnote omitted).

Initially, we note that "prosecutorial responses to defense arguments are clearly permitted[.]" Id. at 587; State v. Sutton, 562 S.W.2d 820, 823-24 (Tenn. 1978) ("Where the criminal defendant raises an issue in his defense, he cannot complain of references to the issue by the prosecution, or argument on that issue, so long as the argument is fairly warranted by the facts and circumstances of the case."). Here, it does not appear that the prosecutor's manifest intent was to comment on the Defendant's right not to testify when he made the first comment. See Jackson, 444 S.W.3d at 588. In addition, based on the transcript of closing arguments, the prosecutor's comments and behavior in the Defendant's case were not nearly "as direct or animated as those of the prosecutor in Jackson." State v. Colvett, 481 S.W.3d 172, 208 (Tenn. Crim. App. 2014). The prosecutor here never demanded that the Defendant explain himself or tell the truth about what happened with P.B. See Jackson, 444 S.W.3d at 589.

Despite the Defendant's claims to the contrary, we do not believe that the prosecutor's comment amounted to an improper comment on the Defendant's exercise of the constitutional right to remain silent. See id. at 587-88. Instead, it appears that these comments were meant to emphasize the extremely short time period between P.B.'s report of the incident to the theater owners and the Defendant's abrupt departure from the theater, which provided strong circumstantial evidence of the Defendant's guilt. A prosecutor is free to argue reasonable inferences from the evidence presented at trial. See State v. Thomas, 818 S.W.2d 350, 364 (Tenn. Crim. App. 1991) (reiterating that "[m]ere argument by the State that proof on a certain point is unrefuted or uncontradicted is not an improper comment upon a defendant's failure to testify" (citation and internal quotation marks omitted)); United States v. Collins, 78 F.3d 1021, 1040 (6th Cir. 1996) (stating that a prosecutor "must be given leeway to argue reasonable inferences from the evidence" and "[w]here there is conflicting testimony, it may be reasonable to infer, and accordingly to argue, that one of the two sides is lying"). Because it does not appear that the prosecutor's manifest intent was to comment on the Defendant's right not to testify or that the jury would necessarily have taken this brief remark to be a comment on the Defendant's failure to testify, we conclude that this comment was not error. However, even if this comment was somehow improper, it was most certainly harmless beyond a reasonable doubt. When considering the nature and extensiveness of the prosecutor's argument, we note that this remark, which was isolated, did not seem aimed at the Defendant's exercise of his right to remain silent and that the Defendant was able to respond to this particular remark during its closing argument. While no curative instruction was given immediately after this comment, the trial court did instruct the jury in its final charge that "[n]othing said or done by the lawyers who have tried this case is to be considered by you as evidence of any fact." A jury is presumed to follow the instructions of the trial court. Banks, 271 S.W.3d at 137; State v. Robinson, 146 S.W.3d 469, 494 (Tenn. 2004); State v. Reid, 164 S.W.3d 286, 346 (Tenn. 2005). Finally, as we have stated several times, the evidence in this case, which consisted of direct and circumstantial proof, was substantial. For these reasons, we

likewise conclude that the Defendant is not entitled to plain error relief because consideration of the error is not necessary to do substantial justice. See State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000).

Second, the Defendant contends that the prosecutor improperly used the position and experience of the District Attorney's office to challenge the Defendant's credibility when she remarked that sexual offenders do not generally admit their guilt. The standard of review in determining whether counsel was allowed too much leeway during closing argument is abuse of discretion. Hall, 976 S.W.2d at 167 (citing State v. Sutton, 562 S.W.2d at 823). The Defendant asserts that the State, by making the aforementioned remarks during closing argument, violated the rule that a prosecutor shall not "express his personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant." State v. Goltz, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003).

Here, the State essentially concedes that the prosecutor's remark was improper but argues that Defendant has failed to show that this comment was so impermissibly prejudicial that a new trial is appropriate. "When evaluating an improper prosecutorial argument that does not rise to the level of a constitutional violation, the test to be applied is 'whether the improper conduct could have affected the verdict to the prejudice of the defendant.'" Jackson, 444 S.W.3d at 591 n.50 (quoting Harrington v. State, 385 S.W.2d 758, 759 (Tenn. 1965)). In making this determination, we should consider the following five factors:

> (1) the conduct complained of, viewed in light of the facts and circumstances of the case; (2) the curative measures undertaken by the court and the prosecutor; (3) the intent of the prosecutor in making the improper statement; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength or weakness of the case.

Id.; see Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976).

We agree that the prosecutor's second comment seems aimed at convincing the jury that because individuals accused sex offenses are very unlikely to admit their crimes, the Defendant in this case must be guilty. See State v. Charles L. Williams, No. M2005-00836-CCA-R3-CD, 2006 WL 3431920, at *22 (Tenn. Crim. App. Nov. 29, 2006). Because it appears that this comment was made to inflame the jury and to appeal to the jurors' prejudices, we conclude that it was improper. Next, we must consider whether the prosecutor's comment prejudiced the Defendant by applying the aforementioned five factors. Id.

Regarding the conduct complained of, viewed in light of the facts and circumstances of the case, we note that the prosecutor remarked that the Defendant corroborated every single detail of the incident except the sexual abuse and then asserted that sexual offenders do not generally admit their guilt in order to show that the Defendant was guilty of the charge offense. As we previously recognized, it is improper for a prosecutor to "express his personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant." Goltz, 111 S.W.3d at 6. Second, as to the curative measures undertaken by the court and the prosecutor, we note that while no curative measures were utilized at the time of this statement, the defense never specifically requested a curative instruction or other measures. However, the trial court's final charge to the jury did include an instruction that statements, arguments, and remarks of counsel are not evidence and that if such statements were not supported by the evidence, then the jury should disregard them. A jury is presumed to follow the instructions of the trial court. Banks, 271 S.W.3d at 137; Robinson, 146 S.W.3d at 494; Reid, 164 S.W.3d at 346.

Third, while we are unsure of the prosecutor's intent in making this remark, we recognize that this comment was made during the prosecutor's initial closing statement and was probably not inadvertent. See Charles L. Williams, 2006 WL 3431920, at *23. Fourth, regarding the cumulative effect of the improper conduct and any other errors in the record, we note that while other errors were made in admitting Sydni Turner's expert testimony and the forensic interview, these errors were harmless, and when viewed along with this isolated prosecutorial comment during closing, do not amount to cumulative error requiring a reversal. Fifth, as to the relative strength or weakness of the case, we have repeatedly recognized that the proof in this case was considerable. In light of the substantial proof of the Defendant's guilt, the isolated nature of this comment, and the trial court's instruction that arguments of counsel are not evidence, we conclude this error did not affect the verdict to the prejudice of the defendant and was, therefore, harmless. Moreover, we conclude that the Defendant is not entitled to plain error relief because this remark did not adversely affect a substantial right of the Defendant and because consideration of the error is not necessary to do substantial justice. See Smith, 24 S.W.3d at 282. Finally, we conclude that the two challenged remarks, when viewed together, did not give rise to cumulative error. Cf. Charles L. Williams, 2006 WL 3431920, at *30 (concluding that "the cumulative effect of the errors in this case more probably than not affected the outcome of the trial, resulted in prejudice to the judicial process, and deprived the Defendant of a meaningful defense"). Accordingly, the Defendant is not entitled to relief.

**V. Sufficiency of the Evidence.** Lastly, the Defendant contends that the evidence is insufficient to sustain his conviction for attempted aggravated sexual battery because his conduct cannot be reasonably construed as being for the purpose of sexual arousal or gratification. He asserts that under the governing standard of review, a touching or attempted touching of P.B.'s intimate parts is not enough to sustain his conviction; instead,

the State must also prove that he acted with sexual intent. The State counters that it presented sufficient circumstantial evidence for a rational jury to have reasonably inferred that the Defendant touched, or attempted to touch, P.B.'s penis for the purpose of sexual arousal or gratification. We agree with the State.

"Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009) (citing State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992)). "Appellate courts evaluating the sufficiency of the convicting evidence must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" State v. Wagner, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)); see Tenn. R. App. P. 13(e). When this court evaluates the sufficiency of the evidence on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010)).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Sutton, 166 S.W.3d 686, 691 (Tenn. 2005); Hall, 976 S.W.2d at 140. The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" Dorantes, 331 S.W.3d at 379 (quoting Hanson, 279 S.W.3d at 275). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence, and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury. Dorantes, 331 S.W.3d at 379 (citing State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006)). When considering the sufficiency of the evidence, this court "neither re-weighs the evidence nor substitutes its inferences for those drawn by the jury." Wagner, 382 S.W.3d at 297 (citing State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997)).

As relevant in this case, a person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense, "[a]cts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense." Tenn. Code Ann. § 39-12-101(a)(3). "Conduct does not constitute a substantial step . . . unless the person's entire

- 41 -

course of action is corroborative of the intent to commit the offense." Id. § 39-12-101(b). "[T]he question of whether a defendant has taken a substantial step toward the commission of a crime sufficient to support a conviction for criminal attempt is necessarily a heavily fact-intensive inquiry determined by the specific circumstances shown in each individual case[.]" Davis, 354 S.W.3d at 733. Completion of the attempted offense is not a defense to prosecution for criminal attempt. Tenn. Code Ann. § 39-12-101(c); see State v. Thorpe, 463 S.W.3d 851, 863 (Tenn. 2015) ("[P]roof, even uncontroverted proof, that a defendant completed a crime, in and of itself, does not shield a defendant from a conviction for criminal attempt of the crime allegedly committed.").

Aggravated sexual battery is "unlawful sexual contact with a victim by the defendant" where "[t]he victim is less than thirteen (13) years of age." Tenn. Code Ann. § 39-13-504(a)(4). "Sexual contact" is defined as "the intentional touching of the victim's . . . intimate parts . . . if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification." Id. § 39-13-501(6). "'Intimate parts' includes semen, vaginal fluid, the primary genital area, groin, inner thigh, buttock, or breast of a human being." Id. § 39-13-501(2).

We note that "the testimony of a victim, by itself, is sufficient to support a conviction." State v. Strickland, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993) (citing State v. Williams, 623 S.W.2d 118, 120 (Tenn. Crim. App. 1981)). By its verdict, the jury accredited P.B.'s testimony, and this court must not disregard the jury's credibility finding on appeal. See Campbell, 245 S.W.3d at 335; Byrge, 575 S.W.2d at 295. In reaching this verdict, the jury also necessary determined that the Defendant took a substantial step toward committing the aggravated sexual battery offense. The Defendant claims that the State failed to present any proof, even circumstantial proof, outside of the touching of P.B.'s penis to show that the Defendant acted for the purpose of sexual arousal or gratification. However, "intent is almost always proven circumstantially." State v. Hayes, 899 S.W.2d 175, 180 (Tenn. Crim. App. 1995). "[T]he location of the events, the state of dress of the defendant and the victim, and how the physical contact occurred" can establish a defendant's intent. Id. P.B. testified that the Defendant blocked the doorway of the bathroom, which prevented P.B. from escaping, and then touched and "squeezed" P.B.'s penis. The aggravated sexual battery statute "does not require that the appellant become sexually aroused or gratified by the sexual contact" and "merely requires touching that can be 'reasonably construed as being for the purpose of sexual arousal or gratification.'" State v. Mahlon Johnson, No. W2011-01786-CCA-R3-CD, 2013 WL 501779, at *12 (Tenn. Crim. App. Feb. 7, 2013) (quoting State v. Roy Chisenhall, No. M2003-00956-CCA-R3-CD, 2004 WL 12177118, at *3 (Tenn. Crim. App. at Nashville, June 3, 2004)). "[J]urors may use their common knowledge and experience in making reasonable inferences from evidence." State v. Meeks, 876 S.W.2d 121, 131 (Tenn. Crim. App.1993) (citing 23A C.J.S. Criminal Law § 1380). Here, the jury could have reasonably determined that an

adult man had no reason to touch or squeeze, or attempt to touch or squeeze, the penis of a six-year-old child in a movie theater bathroom. Viewing the evidence in the light most favorable to the State, we conclude that the proof is more than sufficient for a jury to reasonably infer that the touching was for the purpose of sexual arousal or gratification. Accordingly, the evidence is sufficient to sustain the conviction, and the Defendant is not entitled to relief.

## CONCLUSION

Based on the aforementioned authorities and analysis, we affirm the judgment of the trial court.

_____
CAMILLE R. MCMULLEN, JUDGE